## STATE v. UTLEY.

(Filed April 7, 1903.)

1. HOMICIDE—*Murder in the Second Degree—Manslaughter—Burden of Proof—Harmless Error.*

   In an indictment for murder, if the trial court instructs correctly as to the degree or quantity of proof necessary to reduce the crime of murder to manslaughter and later lays down a contradictory rule by saying that the mitigating circumstances must be proven beyond a reasonable doubt, it is harmless error, there being no evidence tending to reduce the crime to manslaughter.

2. JURY—*Jurors—Special Veniremen—Challenges.*

   In an indictment for murder, where the state stands aside a number of the special veniremen, it is not error for the trial court, after the special venire is exhausted to have the names of those stood aside placed in a hat and drawn again, instead of having them called in the order in which they had been stood aside.

3. EVIDENCE—*Homicide—Declarations.*

   In an indictment for murder, evidence that the accused said immediately after the shooting, "That was a good shot, wasn't it, with my left hand?" is competent.

4. EVIDENCE—*Homicide—Opinion Evidence.*

   In an indictment for murder a witness may state that the prisoner shortly before the killing seemed mad at the deceased.

INDICTMENT against E. L. Utley, heard by Judge *Charles M. Cooke* and a jury, at January Term, 1903, of the Superior Court of CUMBERLAND County. From a verdict of guilty of murder in the second degree, the defendant appealed.

*Robert D. Gilmer, Attorney-General,* and *N. A. Sinclair* and *H. L. Cook,* for the State.

*Thomas H. Sutton* and *Hinsdale & Hinsdale,* for the defendant.

MONTGOMERY, J.   The objections of the prisoner to the charge of the court are embraced in the exceptions, expressed in different forms to those parts which exclude expressly the theory of self-defense and thereby prevented the finding by the jury of a verdict of not guilty, and to those parts which involved the treatment of the law concerning manslaughter as considered in the view of a reduction through mitigating circumstances of the crime of murder.   Included in the above is an exception to the rule laid down by his Honor as to the degree and quality of the proof necessary to show matter of excuse or mitigation.

We will consider the last exception, first in order, for the reason that from our point of view the decision of that question and its bearings will settle the chief matter involved in the appeal.

His Honor, in three separate and distinct parts of his charge, laid down to the jury the correct rule—one long established by the precedents of this court—as to the degree or quantity of proof necessary to show matter of excuse or mitigation, or in other words, to reduce the crime of murder to that of manslaughter.   He told the jury, as we have said above, three times, that when the killing with a deadly weapon is proved or admitted by the prisoner, the burden of showing mitigating circumstances is on the prisoner, who must prove them, not by a preponderance of testimony or beyond a reason-

able doubt, but to the satisfaction of the jury. That was the correct rule as decided by this court in numerous cases from *State v. Willis,* 63 N. C., 26, down to and including cases in the last volume. But in another part of his charge he laid down a rule contradictory of the true one. He instructed the jury: "If you shall find beyond a reasonable doubt that the prisoner, at the time he entered the hall for the last time from the street had no malice against the deceased or intent to kill the deceased, and there was an altercation of words, as testified to by the witness Sim Councill, and that it was in consequence of this altercation of words that both the prisoner and the deceased became angry and both drew their weapons, and no unfair advantage was taken by the prisoner or the deceased and it was a fight upon equal terms and they were upon equal terms, then the prisoner would be guilty of manslaughter for the slaying of the deceased."

One of the grounds of the prisoner's exception to that part of the charge was that the prisoner was required to prove mitigating circumstances, not to the satisfaction of the jury, but beyond a reasonable doubt. The exception was well taken because the instructions were contradictory and we can not tell which the jury acted upon; and unless the error was harmless a new trial will be granted. It was not harmless error if in any aspect of the case the jury could have rendered a verdict of manslaughter under the law.

The question, then, is, the killing of the deceased with a deadly weapon having been found, was there any evidence in the case tending to reduce the crime which the law by presumption fixed upon the prisoner—murder in the second degree?

The discussion of this matter makes it necessary to state the substance of the evidence on this point. The deceased was employed as night clerk in the Hotel LaFayette in Fayetteville, and on the early morning of October 24, 1902, was on

duty at his proper place in the hotel. Some time between eleven and half o'clock and twelve and half o'clock of that morning, the prisoner in an intoxicated condition came down from his room and asked the deceased to let him have five dollars. The deceased said "I have not got it, you can't get it." He said he could not get to the money. The prisoner then said "I will have it, and at the same time pulled out his pistol and cursed him," and added, "I will have Mac to fire you in the morning." The deceased then went to the desk back of the office where the register was, and was looking down in the money drawer when the prisoner fired his pistol. The deceased said, "Mr. Utley, what do you mean?" Verna Moore, who was with the prisoner, said to the prisoner, "Ed., did you shoot at him?" The prisoner said "No, I shot over him to scare him." At that time, according to the evidence of Moore, two guests arrived at the hotel (about twelve and half o'clock, according to their evidence) and the deceased saw them to their rooms. About the time they had gotten between the first landing and the hall up stairs the prisoner shot his pistol several times across the lobby towards the pool room in the direction where the stairs went up, not shooting at any person, but at the wall, filling it full of balls. After that time, Utley and the witness Moore, went up to Utley's room. Moore testified that after they got to Utley's room, Utley said, "He has gone after Benton," and then, further, he said and repeated, "I called him a son of a b——, didn't I?" Moore said further that after they got to Utley's room he got a bottle of whiskey and Utley got some cartridges out of a trunk or valise beside his door. Moore said to the prisoner, "Ed, don't get the cartridges, you might shoot me." He answered, "No, I won't shoot you." Utley further said "that man would not let me have five dollars on my check," and something else about raising some money. Moore further testified that he and Utley left the room and went down stairs, that about that

time Hollingsworth came in, and then Benton.  A witness (Jones) who was living at the hotel and occupied the room adjoining the prisoner's, a door between, testified that the conversation between Moore and Utley kept him awake and he read until about twelve o'clock.  They left the room and some time after that he heard pistol shots like they were in the hotel. Then Moore and the prisoner came back to the room, which attracted his attention, and he heard what they said.  He testified that he heard the prisoner say he had plenty of cartridges and was going to load his pistol.  Whereupon Moore said "Ed, don't do that, you might kill me;" that then the prisoner said "No, Verna, I am not going to kill you," then the prisoner said, "Just think, that God damned scoundrel would not give me five dollars on my check when I can raise more cash money to-day than any man in Fayetteville."  The prisoner then said, "I called him a G—d d——d son of a b——h.  I called him a G—d d——d son of a b——h, didn't I?" and Moore said "You called him that."  The witness Jones further testified that he heard the prisoner say that he was going down and if any man said a word to him he was going to fill that office full of balls.  That witness said further that the prisoner seemed to be mad with the man who would not let him have the five dollars, that he spoke as if he was insulted.

J. H. Benton, a witness for the State, testified that at the time of the homicide he was a policeman of the town of Fayetteville, and that he saw the deceased for the first time on that morning at the Coast Line passenger depot somewhere between twelve and one o'clock; that afterwards he went to the hotel immediately, following the deceased; that the witness then with the prisoner and others went into a small back room, where the water cooler was and talked a while, taking a drink of whiskey in the meanwhile; that the prisoner was abusing Hollingsworth a little--just an ordinary conversation;

that Hollingsworth was in the office part of the building behind his desk at the counter; that he heard him, he thought, use some very harsh words towards Hollingsworth. The witness said "A little after that, Utley and myself went to the front door. I said, 'I believe I will go back to the depot. You go up stairs and go to bed.' He spoke like he was going to do it. I walked possibly a few steps in front of the barber shop, and then went across the street and got in front of the bank. Just as I got there I saw Hollingsworth come to the front door. I went back to the hotel. Then I walked on down street. As I got between the hotel corner and Graham's book store, I heard some one coming down from Donaldson street towards your office, Judge Shaw. I walked possibly as far as Clark's store, a gentleman came up to me and said 'Where are you going.' That was Utley. I said I thought I would go down to see my friend Wicker, a policeman at the market house. We walked on five or six steps. Utley said 'I believe I will go back.' He then came up towards the hotel. I proceeded about three or four steps and crossed the street again, going in front of the bank opposite the hotel. Just as I got there, I heard very rapid shooting." The witness further said that he went into the hotel, and as he went in he saw the prisoner about half way between the bottom of the steps and the first landing going up the steps; that no one else was there. And that he saw a colored man, Simeon Councill, run out of the hotel at the time of the shooting.

A. B. Black, a witness for the State, testified that about 12:15 he was in the wash room where the water cooler was with the prisoner and others and he heard him say: "Old man Hollingsworth is a son of a bitch." That witness continued: "That was the only thing I heard him say in an off-hand manner—not in a threatening manner at all."

All of the evidence was to the effect that the prisoner's right hand was disabled and that the pistol firing was from his left

hand; and Benton, the policeman, said that a minute or two after the killing he and the prisoner went to where the body of Hollingsworth was lying on the floor, and that the prisoner said "It was a damned good shot, Mr. Benton, wasn't it, with my left hand?"

Simeon Councill, who was night porter at the hotel, said: "I was in the hotel just before the killing. I was night porter. When Mr. Utley came into the office I was standing near the door. He told me he had been shooting his gun in the office and showed me the ball holes in the steps near the pool room door. He talked in good humor to me. I did not go out of the office. He looked over towards where Mr. Hollingsworth was and said he was going to have Castaret turned off in the morning. Mr. Hollingsworth was standing at the lower corner of the desk near the wine room. Mr. Utley was then standing near the cigar stand and just in front of it. I was also near the cigar stand. The cigar stand is near the pool room door and opposite the desk. Mr. Utley cursed him and called him several times (the epithet too obscene to be mentioned) and went on across the room towards him cursing him and pointing the finger of his right hand at him, with his left hand in his coat pocket. His right hand had some cloth around it on account of a dog bite. Mr. Hollingsworth said 'I don't care if you do have me turned off.' He said that because Mr. Utley had said 'I'm going to have you turned off in the morning.' When Mr. Utley got near the counter, eleven feet off, he (used the same epithet which, as we have said, is too obscene to mention) and then Mr. Hollingsworth pointed the pistol at him and I ran out of the door. I did not see Mr. Utley take his pistol out of his pocket and did not see his pistol till after the killing. It was about as far as from here to Mr. Bolton. I did not see Mr. Utley take his hand out of his pocket. I heard the report of the pistol shots after I got out of the door. I was standing right at the door

when I started out just before I left the office. I did
not see what he was doing as I started to run out of the office,
but the last time I saw him, his left hand was in his pocket.
I did not take notice of his right hand then. I did not see
any one in the office at the time except Mr. Utley and Mr.
Hollingsworth, as I went to run, going up the street, Mr.
Benton came across the street from the bank and he halted
me. I had seen Mr. Utley on the day of the killing and the
day before. He was drinking one of the days, I think the
day the dog bit him, the day before the killing."

The remaining evidence of that witness is not material, ex-
cept that part of it embraced in the witness' examination
before the coroner, in which he said that Hollingsworth told
the witness that on the first occasion of the prisoner's firing
his pistol he shot at him (Hollingsworth). Two witnesses,
Duke and Fowler, testified that when the deceased took them
to their rooms, about the time of the first pistol firing, he
asked them if either one had a pistol, and, upon their answer-
ing in the negative, he said he had a good one, but could not
get at it, and that he said further, "Well, I will go back
down stairs and see if I can not quiet those boys." Those two
witnesses said when they reached the hotel and found the
door locked, they looked through the glass and saw three
gentlemen standing in a group in front of the safe.

There was some difference in the evidence as to the time
when the prisoner first fired the pistol. The witness Moore
thought it was somewhere about 11:30 o'clock, while from
other witnesses it appeared to be about 12:30. The wit-
nesses Jones and Black, substantially agreed that the last
firing of the pistols, when Hollingsworth was killed, was
about 1:30. Jones said that the prisoner and Moore left the
prisoner's room just before the first firing, about 12:15, and
not very long thereafter he heard the shots, and that the
second firing, when Hollingsworth was killed, was 25 minutes

to two, and just before that firing the prisoner went down from his room the last time.

The jury having found that the prisoner killed the deceased with a pistol the law presumes malice and the killing is therefore murder in the second degree. *State v. Hicks,* 125 N. C., 636. In addition to the presumption of malice on the part of the prisoner arising from the killing of the deceased with a deadly weapon, the whole of the evidence bearing on the homicide, except the testimony of Simeon Councill, is to the effect •that there was express malice in the killing. Is there anything in the evidence of Sim Councill tending to show mitigating circumstances, to reduce the crime of which the prisoner was convicted to that of manslaughter? Looking at it in the light most favorable to the prisoner, we think there is no such evidence. *State v. Howell,* 31 N. C., 485. This homicide was the result of one continuous transaction. The whole occurred, according to some of the witnesses, within one hours' time, and, according to others, within two hours' time. It commenced because the deceased did not lend the prisoner five dollars, and that, too, after he had told him that he could not get to the money; and from that time until the fatal shot was fired there is not a particle of evidence going to show that the catastrophe was the result of any intervening cause. It is not a case where there was an old grudge, and a sudden or an accidental meeting in which fresh provocation was offered to the prisoner and where the rule, as laid down in *State v. Johnson,* 47 N. C., 247; 64 Am. Dec., 582, applies, the alleged affront was on the mind of the prisoner through all the time up to the killing and the weapon prepared, according to the evidence. When everybody but Councill had left the hotel, including the policeman Benton, the prisoner, according to the evidence of Simeon Councill, without one word having been spoken to him by the deceased, or without himself speaking one word to the deceased, advanc-

ed upon the deceased with his left hand in his coat pocket, cursing him and pointing the finger of his right hand at him, and using an epithet too obscene to be mentioned.    When within eleven feet of the deceased, according to the evidence of Councill, the deceased drew a pistol and presented it at the prisoner; whereupon the prisoner with his left hand fired two shots causing wounds in the head and shoulder, either one of which would have caused death, death from the wound in the head being instantaneous.    It was contended here for the prisoner that the language used by him when he advanced upon the deceased, according to Councill's evidence, viz., "I am going to have you turned off in the morning," was explanatory of his intention and showed that his purpose was not to kill the deceased.    In the light of the whole evidence of this case that contention can not be a sound one.    There was evidence of express malice and preparation to do the deed, and the declaration that the prisoner would do another injury to the deceased on the morrow can not be evidence of mitigation of his offense.    It was an aggravation, rather.    It was also contended here that the declaration of the prisoner, made after firing the first shot, according to the evidence of the witness Moore, "that he shot to scare the deceased," was evidence that he did not intend to kill him.    If that was so (although the deceased said to Councill that the prisoner shot at him, the deceased) that was no evidence to be submitted to the jury on the question of mitigation, or as to the intention of the prisoner when he killed the deceased.    The deceased was killed at his place of business in the discharge of his duty, never having used one offensive word to the prisoner.    We think, therefore, that the error in the charge was harmless error.

From this view of the case the other exceptions to his Honor's charge and his refusal to give the special instructions requested by the prisoner's counsel need not be considered,

for they relate to the phases of manslaughter and killing in self-defense.

On the trial, fourteen jurors were stood aside by the State, and when all the other veniremen had been exhausted the prisoner's counsel moved that the jurors who had been stood aside should be called in the order which they had been stood aside. The court, in its discretion, refused the motion and ordered that the names be returned to the hat and drawn again, and the prisoner excepted. That was no ground of exception. It can not be even plausibly argued that such a course was injurious to the prisoner. All that he could expect or demand was a fair jury, and what would be a juster plan than the one adopted by his Honor. It can not be seen that uniformity of practice by the courts in the manner insisted on by the prisoner is more desirable than the manner adopted by his Honor. Either way is perfectly just and fair.

There were two matters of evidence excepted to by the prisoner. The witness Benton was asked: "Describe his position (that of the dead body) and what was said, if anything?" The prisoner's counsel objected upon the ground that the prisoner was under arrest and had not been properly cautioned. Whereupon the witness stated he had not held out any inducement to the prisoner to make a statement; that he had not told him it would be better to make a statement and had not offered him anything to make a statement, and that the declaration was made in one or two minutes after the killing. The witness answered that the prisoner said "That was a damned good shot, Mr. Benton, wasn't it, with my left hand?" The answer was objected to by the prisoner on the ground that it did not tend to prove either malice or premeditation. We think it was competent to show that the prisoner killed the deceased as well as to show that he had sufficient understanding to know what he was doing, which was contested on the trial because of intoxication.

The witness Jones was asked: "On the night that you heard the conversation between Utley and Moore, in his room, the night of the killing, state what was Utley's humor at that time?" The prisoner objected. The witness answered, "Well, he spoke as if he was insulted. He seemed to be mad with the man who would not let him have the five dollars." The prisoner objected upon the ground that "This witness had already told what he knew about it, and that the witness said, not that he was mad, but that he seemed to be mad." The objection was overruled and the prisoner excepted. There is no merit in the exception.

The judgment is

Affirmed.